USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/25/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANDREA EMANUEL,

       Plaintiff,

   -against-

STATE OF NEW YORK and DEPARTMENT
OF CORRECTIONAL SERVICES ("DOCS"),

       Defendants.
------------------------------------------------------------X

08 Civ. 1250 (RMB) (THK)

**DECISION & ORDER**

## I. Introduction

On or about February 5, 2008, Andrea Emanuel ("Plaintiff" or "Emanuel"), a correction officer, filed a complaint ("Complaint") against the State of New York and the New York State Department of Correctional Services ("DOCS") ("Defendants") pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), alleging, among other things, that Defendants "refused to make a reasonable accommodation" for Plaintiff when they "denied [her] request to . . . reassign her to a different area while painting was taking place."[1] (See Compl., dated Feb. 5, 2008, ¶¶ 14, 50, 104–15.)

On July 13, 2009, Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") arguing, among other things, that: (1) Plaintiff fails to allege a disability under the Rehabilitation Act because: [i] Plaintiff "cannot

---

[1] On November 10, 2008, the Court granted in part and denied in part Defendants' motion to dismiss, dated June 16, 2008 [#14], as follows: the Court dismissed Plaintiff's claims against Defendants, pursuant to Titles I and V of the Americans with Disabilities Act of 1990 and 42 U.S.C. § 1983; the Court dismissed Plaintiff's claim against Defendants of a "hostile work environment in violation of the Constitution of the United States and applicable statutes"; and the Court dismissed all claims against Plaintiff's supervisors, namely Lt. Salvatore Munafo ("Lt. Munafo"), Lt. George Van Valkenburgh ("Lt. Van Valkenburgh"), Lt. Robert Murray ("Lt. Murray"), and Sgt. Robert Wilson ("Sgt. Wilson"). (See Order, dated Nov. 10, 2008, at 2 n.2, 19.)

establish that her asthma substantially limits her ability to work and breathe"; [ii] "there [is] an insufficient record of [Plaintiff's] asthma impairment"; and [iii] Plaintiff "presents no evidence showing that [Defendants] perceived her as having an impairment that substantially limited a major life activity"; and (2) Defendants did not fail to provide a reasonable accommodation to Plaintiff but "rather were evaluating whether [Plaintiff] had a medical condition requiring an accommodation" and "the priority was to get her medical attention rather than [to] determine whether she needed to be reassigned." (Mem. of Law in Supp. of Defs.' Mot. for Summ. J., dated July 13, 2009 ("Def. Mem."), at 1, 13, 20–23 (internal quotations omitted).)

On August 13, 2009, Plaintiff filed an Opposition arguing, among other things, that: (1) "the trier of facts may be able to conclude" that Plaintiff is "disabled" because: [i] "Plaintiff has been diagnosed with disabilities of Asthma, Graves Disease and hyperthyroid[ism], which physically and mentally substantially impair[] one or more of her major life activities"; [ii] "Plaintiff has submitted doctor's notes explaining her disability"; and [iii] "Defendants were well aware of [Plaintiff] having physical impairments that affected her major life activities"; and (2) Defendants "refused to accommodate [Plaintiff] when she requested that she be allowed to go to any other post . . . because of toxic fumes from painting that was being done" in the unit where she was assigned on June 7, 2007. (Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., dated Aug. 13, 2009 ("Pl. Opp'n"), at 2–3, 13.)

On August 24, 2009, Defendants filed a reply. The parties waived oral argument.

**For the reasons set forth below, Defendants' motion for summary judgment is granted.**

2

## II.   Background

On May 2, 1988, Plaintiff began working for DOCS as a correction officer. (See Defs.' Statement Pursuant to Local Rule 56.1, dated July 13, 2009 ("Def. 56.1"), ¶ 1; Pl.'s Resp. to Defs.' Local Rule 56.1 Statement ("Pl. 56.1") and Counterstatement of Facts ("Pl. 56.1 Counterstatement"), dated Aug. 13, 2009, ¶ 1.) During the course of her employment, she was assigned to the Lincoln Correctional Facility ("Lincoln") on West 110th Street in Manhattan, New York. (See Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1; Decl. of Julinda Dawkins, dated July 13, 2009 ("Dawkins Decl."), Ex. B (Dep. of Andrea Emanuel, dated Dec. 10, 2008 ("Emanuel Dep.")), at 45:6-9, 47:24-25.) Plaintiff worked as a relief officer, and "whenever the [regular] officer had . . . days off, [Plaintiff] would fill in." (Emanuel Dep. at 41:14-15, 47:24-25.) At her deposition, Plaintiff testified that she had been "out of work since June [2008]." (Emanuel Dep. at 171:10-12.)

On or about August 16, 2005, Samuel Melamed, M.D. ("Dr. Melamed") diagnosed Plaintiff as having bronchial asthma. (See Dawkins Decl. Ex. T (Selected Medical Documentation), at 1.) Plaintiff stated in an affidavit that during 2005 she was absent from work due to asthma for five days. (Aff. of Andrea Emanuel, executed Nov. 16, 2009 ("Emanuel Aff."), ¶ 6; see Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.)

On or about October 25, 2006, an ear-nose-throat ("ENT") doctor prescribed Albuterol (an inhalant) and Singulair for Plaintiff for "asthma and allergic rhinitis." (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10; see also Dawkins Decl. Ex. T at 16.) Despite the diagnosis of asthma in 2005, Plaintiff testified that when the ENT doctor informed her in October 2006 that she was asthmatic, Plaintiff "didn't believe it so [she] didn't do anything about it." (Emanuel Dep. at 60:13-25.)

3

In early November 2006, Plaintiff was "at the gym taking a couple of classes and became short-winded" ("Gym Incident"). (Emanuel Dep. at 63:20-25.) It does not appear that Plaintiff was carrying an inhaler with her at the time, although one had been prescribed in October.[2] (See Emanuel Dep. at 63:20–64:6.) Plaintiff testified that "one of the girls in the class . . . was an asthmatic so she gave [Plaintiff] her pump," and Plaintiff "felt much better" after using the pump inhalant. (Emanuel Dep. at 64:2-6.) Plaintiff also testified that after the Gym Incident she realized "maybe what the [ENT] doctor said was true," so she decided to be examined by a pulmonologist. (Emanuel Dep. at 64:6-8.) On or about November 2, 2006, after additional testing, a pulmonologist determined that Plaintiff had "bronchial asthma" and "allergic rhinitis" and he (also) prescribed Albuterol and Singulair to Plaintiff, as well as Allegra. (Dawkins Decl. Ex. T at 17; see also Def. 56.1 ¶¶ 10, 12; Pl. 56.1 ¶¶ 10, 12.)

Plaintiff testified at her deposition that there are no "things that [she] used to do before [she was] diagnosed as being asthmatic that [she] cannot do at all now." (Emanuel Dep. at 70:4-11.) She also stated that "she learned how to breathe" and "how to control [her] environment"; and "[a]s long as [she is] not in certain areas [and she is] not around certain things, [she is] fine and, also, as long as [she] take[s] the [Singulair]." (Emanuel Dep. at 70:4-11.)

Plaintiff also testified about her conditioning and stated that she doesn't "even ride the elevator [at Lincoln, which] goes up to the ninth floor"; she "always walk[s] up and down"; her "lungs are strong because [she doesn't] ride" the elevators; and she "walk[s] to expand [her] lungs] to keep them healthy." (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14; Emanuel Dep. at 78:20-25.) Plaintiff also acknowledged that she continued going to the gym until June 2008, when she injured her right hand. (See Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11; Emanuel Dep. at 49:2-10.)

---

[2] See infra at 5.

4

According to Plaintiff, at or about 7:15 a.m. on June 7, 2007, a maintenance crew showed up to paint the offices in the Restriction Unit, where Plaintiff was assigned that day (and where she worked, on average, twice weekly prior to June 7, 2007). (See Def. 56.1 ¶¶ 18–19; Pl. 56.1 ¶¶ 18–19; Emanuel Dep. at 88:18-23, 162:23–163:5; Dawkins Decl. Ex. Y (Dep. of Sgt. Robert M. Wilson, dated Jan. 28, 2009 ("Wilson Dep.")), at 18:8-15.) Sometime before 8:30 a.m., Plaintiff conducted a "count" of the prisoners in the Restriction Unit, and then left the unit. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23.) Plaintiff testified that she believes the paint crew was preparing to paint when she returned and at that point she encountered paint fumes. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23; Emanuel Dep. at 105:23-25, 106:12-13.) Plaintiff "started gulping for air," her chest became tight, and she "felt . . . asthma coming on." (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23; Emanuel Dep. at 105:23-25, 106:12-13.) At the time, Plaintiff did not regularly carry an inhaler with her. (See Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13; Emanuel Dep. at 140:2-14 ("Q. Before the [June 7, 2007] incident did you walk around with an inhaler?  A. There was no need for me to walk around with an inhaler because I was in an environment where [the asthma] didn't affect my breathing or my respiratory.").) Plaintiff left the Restriction Unit "maybe a minute or a second" later. (Emanuel Dep. at 106:4-8, 117:8–118:3.)

At approximately 8:30 a.m. on June 7, 2007, Plaintiff "informed Sgt. Wilson that the paint fumes in the Restriction Unit were aggravating her asthmatic condition," and requested that he reassign her to "another post or area." (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.) Sgt. Wilson testified that for "a matter of seconds" he spoke with Lt. Murray, the watch commander, and that Lt. Murray denied Plaintiff's request. (Wilson Dep. at 38:13-22 ("Q. Did [Lt.] Murray make any type of statements in regard to Officer Emanuel when you went to him to state what [her] request was?  A. I don't recall any statements to me, sir.").) Sgt. Wilson testified that he then informed

5

Plaintiff that her request had been denied. (See Dawkins Decl. Ex. I (Mem. from Sgt. R. Wilson to Lt. G. Van Valkenburgh, dated June 7, 2007 ("Wilson Mem."), at 1; Wilson Dep. at 38:23–39:9 ("Q. After [Lt.] Murray denied Officer Emanuel's request, what did you do? A. I recall informing Officer Emanuel that the request was denied. Q. Did you tell Officer Emanuel why it was being denied? A. No, sir. I don't recall making a statement like that. Q. Do you recall if Officer Emanuel asked as to why it was being denied? A. I don't recall that, sir.").) Plaintiff testified that, following her complaint, Sgt. Wilson "said he would send a relief [officer] and told [her] to go downstairs to medical." (Emanuel Dep. at 101:11-17.)

It appears that Plaintiff did not go back to the Restriction Unit on June 7, 2007 and that she was not exposed to paint fumes again. (See Emanuel Dep. at 106:4-8, 117:8–118:3 ("Q. How long after the conversation with Sgt. Wilson did you go to the medical unit? A. Around 10, maybe 10 or 15 minutes. Q. At that time, did Officer John come and relieve you? A. Yes, she did."), 122:6-8 ("Q. Once you were relieved did you go immediately to the medical unit? A. Yes, I did.").)

By approximately 9:00 a.m., Plaintiff had arrived at the medical unit where Registered Nurse Jennifer Hernandez ("Hernandez") examined her. (See Def. 56.1 ¶¶ 32, 35; Pl. 56.1 ¶¶ 32, 35.) According to Plaintiff, she was examined and was treated with a nebulizer for approximately half an hour. (Emanuel Dep. at 123:2–125:5.) Sgt. Wilson came to the medical unit during Plaintiff's examination, and Hernandez "asked [Sgt.] Wilson if [Plaintiff] could be reassigned to another area because of her respiratory issues." (Def. 56.1 ¶ 34; Pl. 56.1 ¶ 34.) Sgt. Wilson responded to Hernandez that "the request was denied by [his] supervisor, the watch commander." (See Def. 56.1 ¶¶ 34–35; Pl. 56.1 ¶¶ 34–35; Wilson Dep. at 50:10-14; Emanuel Dep. at 125:15-19, 22-25.)

6

Plaintiff testified that, soon thereafter, Sgt. Wilson called her at the medical unit, and told her "either . . . go back [to the] Restriction [Unit] or go home." (Emanuel Dep. at 133:6–134:14.) Plaintiff did not go back to the Restriction Unit. (See Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Emanuel Dep. at 127:23.)

At or about 12:00 p.m. on June 7, 2007, Plaintiff, Hernandez, and Sgt. Wilson each completed portions of an Employee Accident/Incident Report. (Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40; (Decl. of Rocco G. Avallone, dated Aug. 13, 2009 ("Avallone Decl."), Ex. H (Employee Accident/Injury Report, dated June 7, 2007).) Plaintiff wrote, "At approximately 8:10 a.m., I . . . informed Sgt[.] Wilson, if I could be relocated from my post due to the inmates['] painting the Restriction Housing Unit office, which would . . . activate my asthma condition. As a result of not being moved I suffered shortness of breath and tightness of the che[st]." (Avallone Decl. Ex. H.) Sgt. Wilson wrote, "Officer Emanuel reported to me that the 'paint fumes' aggravated a chronic respiratory condition she has. I instructed her to see the facility nurse, which she did[.]" (Avallone Decl. Ex. H.) Hernandez wrote that Plaintiff had "shortness of breath" and that she had "advised Plaintiff to avoid causative factors such as paint fumes and [to] get an evaluation from [a] medical doctor." (Avallone Decl. Ex. H.)

After her medical treatment on June 7, 2007, Plaintiff, as noted, did not return to the Restriction Unit. (See Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Emanuel Dep. at 127:23.) Rather, she "punched out" at 12:30 p.m. and left Lincoln to go to the office of a pulmonologist, which she believed was located at 118th Street and Madison Avenue. (See Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Emanuel Dep. at 127:23, 138:3-14.) Upon arriving at that address, she learned that the pulmonologist had relocated to the Bronx and a receptionist offered her "a couple of other doctors' names that [she] could go to or call to set up an appointment because of the asthma."

7

(Emanuel Dep. at 86:2-5, 138:3-14; see also Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41.) She then walked to Central Park, at which point she "was feeling much better because . . . the nebulizer eliminated the symptoms" and "everything just after receiving the treatment . . . was fine." (Def. 56.1 ¶¶ 41–42; Pl. 56.1 ¶¶ 41–42; Emanuel Dep. at 139:3-19.) She waited on a park bench until it was time for her to punch in again at work at 3 p.m. on June 7, 2007 to work a "shift swap" for another correction officer. (Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Emanuel Dep. at 139:3-12.) Plaintiff returned to Lincoln at approximately 2:30 p.m. for the "3:00-11:00 p.m. shift . . . at the gate in the processing area" and completed the shift without "any medical complaints." (Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43; Emanuel Dep. at 141:11-15.)

Plaintiff testified that she called in sick the next day, June 8, 2007. (See Def. 56.1 ¶¶ 44–45; Pl. 56.1 ¶¶ 44–45; Emanuel Dep. at 128:24–129:19.) She was examined on June 8, 2007 by Dr. Frank Babb ("Dr. Babb"), an internist and pulmonologist who provided her with a medical note stating that Plaintiff "had an asthma exacerbation on June 7, 2007 . . . brought on by paint fumes in her work environment." (See Def. 56.1 ¶¶ 44–45; Pl. 56.1 ¶¶ 44–45; Emanuel Dep. at 128:24–129:19; Dawkins Decl. Ex. T at 3.) Dr. Babb also completed a Certification of Health Care Provider form on June 8, 2007, which states: Plaintiff is "not incapacitated"; she is "able to work"; she "can perform normal duties"; her "condition is generally well controlled"; and Plaintiff's "continuing treatment" involves "maintenance care every 6 [weeks] to 2 months." (Def. 56.1 ¶ 46; Pl. 56.1 ¶ 46; Dawkins Decl. Ex. T at 7–9.)[3]

Plaintiff testified at her deposition that there were three instances in her life when she experienced "any . . . kind of effects from [her] asthma": (i) the Gym Incident in early

---

[3] On the Certification of Health Care Provider form, Dr. Babb does not define "maintenance care," nor does he indicate whether he prescribed any medications to Plaintiff on June 8, 2007. (See Dawkins Decl. Ex. T at 7–9.)

8

November 2006; (ii) the June 7, 2007 paint incident at Lincoln; and (iii) an August 2007 incident during which she needed to use an inhaler because there was "a lot of dust [and] plaster" when Con Edison was "installing electrical outlets throughout [her] apartment." (Emanuel Dep. at 69:2–70:3 ("Q. Now, other than the three instances that you just told me about, have there been any other incidents with asthma? A. No.").)[4]

Plaintiff also testified at her deposition that: Lt. Munafo, who is responsible for "time and attendance" matters at Lincoln, knew about her medical conditions because "[h]e's the one who reads your medical papers" and "[e]verything went through him"; that Lt. Murray knew about her medical conditions because "once he was told that [she] was sick" and "he knew what caused it, the reason why [she] was ill"; and that Sgt. Wilson knew about her medical conditions after Plaintiff offered to give allergy medication to him sometime prior to June 7, 2007 because "he has allergies, too" and Plaintiff "didn't need [the medication] anymore." (Emanuel Dep. at 71:20–72:24, 152:13–153:4.) Plaintiff further testified that "everybody [knew] what everybody [was] suffering from" at Lincoln, including "how the painting would affect [Plaintiff]" because "[t]hat's just how the jail is." (Emanuel Dep. at 113:10-17.)

Plaintiff contends that Defendants "switched [her] post . . . due to [her] respiratory illnesses" on two occasions prior to June 7, 2007 when Defendants were "plastering or doing something with the holes" (April 2007) and when they were "stripping the floors" (sometime in 2006 or 2007). (Emanuel Dep. at 103:9–104:6.)

Plaintiff also testified at her deposition that, in or about 2002, she was diagnosed with Graves Disease (and hyperthyroidism). (See Emanuel Dep. at 10:11-20, 49:20-23, 52:5-12, 57:14-24.) With respect to Graves Disease, Plaintiff also acknowledged that "there [are no]

---

[4] It is unclear from the record how this testimony reconciles with the absences from work in 2005 referred to supra at 3. (See also Dawkins Decl. Ex. T at 1; Emanuel Aff. ¶ 6.)

9

things that [she] used to do before the diagnosis that she cannot do at all" now and that "there [are no] things that [she] used to do before the diagnosis that she [does] now with difficulty." (Emanuel Dep. at 59:14-23.)

### III. Legal Standard

Summary judgment is appropriate "'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Crawford v. Dep't of Investigation, 324 F. App'x 139, 141 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). In ruling on a summary judgment motion, the Court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's] favor." Id. (citation omitted). A "plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment," Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997), because "allowing 'a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial' in all employment discrimination actions." Deebs v. Alstom Transp., Inc., No. 08 Civ. 2602, 2009 WL 3004088, at *2 (2d Cir. Sept. 21, 2009) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). Thus, "[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation omitted).

### IV. Analysis

#### (1) Disability Under the Rehabilitation Act

To establish a prima facie case under the Rehabilitation Act, a plaintiff must show,

among other things, that she is "disabled" under the meaning of the Act. See Bush v. Mukasey, 268 F. App'x 41, 41 (2d. Cir. 2008). That is, a plaintiff must demonstrate that she: "'[i] has a physical or mental impairment which substantially limits one or more of [her] major life activities, [ii] has a record of such an impairment, or [iii] is regarded as having such an impairment.'" Id. (quoting 29 U.S.C. § 705(20)(B)); see also Gentile v. Potter, 509 F. Supp. 2d 221, 235 (E.D.N.Y. 2007) ("As a threshold matter, [a] plaintiff bears the burden of demonstrating that [her] disability fits into the narrow definition envisioned by the Rehabilitation Act.").[5]

### (i) Actual Disability

Defendants argue, among other things, that Plaintiff's "asthma does not substantially limit her ability to breathe . . . because [it] does not impair her breathing in general, especially where there are no difficulties breathing outside the work environment" and her asthma does "not substantially limit her ability to work." (Def. Mem. at 17, 19.) Plaintiff counters, among other things, that "[P]laintiff's [a]sthma causes her shortness of breath, coughing, tightness of her chest, periods where she gulps for air and increased susceptibility to respiratory infections"; and that she "was forced to miss work due to her [a]sthma and required medical care" on "at least two occasions within two years prior to the June 7, 2007 incident." (Pl. Opp'n at 12–13.)

---

[5] To prove discrimination under the Rehabilitation Act, a plaintiff must show: "(1) that the employer is subject to the Act; (2) that the plaintiff is an individual with a disability; (3) that, with or without reasonable accommodation, the plaintiff could perform the essential functions of her job; and (4) that the employer had notice of the disability and failed to provide a reasonable accommodation." Brown, 2007 WL 959375, at *3 (citing Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1515 (2d Cir. 1995)). Because, as will be shown, Plaintiff has failed to establish that she suffers from a disability within the meaning of the Rehabilitation Act, the Court does not address the other three elements of a prima facie claim. See Nicholson v. West Penn Allegheny Health Sys., No. 06 Civ. 0814, 2007 WL 3120275, at *9 n.5 (W.D. Pa. Oct. 23, 2007), aff'd, 297 F. App'x 157 (3d Cir. 2008); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973).

11

To establish an actual disability, a plaintiff must show that she "has a physical or mental impairment which substantially limits one or more of [her] major life activities." Bush, 268 F. App'x at 41.[6] "[S]ubstantially limits" means "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity." Droutman v. N.Y. Blood Ctr., Inc., No. 03 Civ. 5384, 2005 WL 1796120, at *6 (E.D.N.Y. July 27, 2005) (quoting Hendler v. Intelecom USA, Inc., 963 F. Supp. 200, 206 (E.D.N.Y. 1997)). "In determining whether a plaintiff is disabled . . . [i]n a case involving asthma, the court should . . . 'consider the extent to which plaintiff is able to control [her] asthmatic symptoms,' through the use of corrective measures such as inhalers or other medications." Id.; see also Muller v. Costello, 187 F.3d 298, 314 (2d Cir. 1999).

Plaintiff has failed to provide (non-conclusory) information to permit a trier of fact to conclude that asthma substantially limited the life activities of breathing or working – or any other major life activity. See Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 724 (2d Cir. 1994); Droutman, 2005 WL 1796120, at *6 (plaintiff's "asthma clearly did not 'substantially limit' her major life functions"); Mutts v. S. Conn. State Univ., 242 F. App'x 725, 728 (2d Cir. 2007) ("Although [plaintiff] produced evidence of five absences from her job . . . over a three year period due to asthma attacks, this alone does not establish that [her] condition substantially limited . . . her ability to work.").

Plaintiff acknowledged at her deposition that: her "lungs are strong"; she doesn't ride the

---

[6] The ADA and the Rehabilitation Act "use identical definitions of 'individual with a disability,' and ADA case law is applicable to the Rehabilitation Act." Brown v. Principi, No. 04 Civ. 1232, 2007 WL 959375, at *4 n.7 (S.D.N.Y. Mar. 29, 2007) (citing Francis v. City of Meriden, 129 F.3d 281, 285 n.4 (2d Cir. 1997)).

elevators but, rather, walks the stairs at work; she "walk[s] to expand [her lungs] to keep them healthy"; she "take[s] [Singulair] every night and she [doesn't] have any problems"; and prior to June 7, 2007, she felt "there was no need for [her] to walk around with an inhaler because she was in an environment where [her asthma] didn't affect [her] breathing or [her] respiratory." (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14; Emanuel Dep. at 70:7-11, 78:20-25, 140:10-14); see Muller, 187 F.3d at 314 ("substantial physical activity without encountering debilitating allergens cuts against [plaintiff's] claim of disability"); Heilweil, 32 F.3d at 723 (plaintiff's "ability to breathe restricted her only in a limited way, and did not bar her from exercising"). Plaintiff also conceded that there are no "things that [she] used to do before [she was] diagnosed as being asthmatic that [she] cannot do at all now"; and that she continued going to the gym until June 2008 (when she injured her right hand). (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11; Emanuel Dep. at 49:2-10, 70:4-11; Emanuel Aff. ¶ 15.) Plaintiff testified that the asthma incident at her gym in November 2006 was the only instance prior to June 7, 2007 when she experienced "any . . . kind of effects from [her] asthma."[7] (Emanuel Dep. at 69:2-70:3.) She also acknowledged that her treatment on June 7, 2007 "eliminated the symptoms," and she completed another full shift from 3 p.m. to 11 p.m. that same day without "any medical complaints." (Emanuel Dep. at 139:13-19;140:15–141:12.)

Plaintiff's medical submissions fail to raise a triable issue of fact as to whether Plaintiff was substantially limited in any major life activity. See Brown, 2007 WL 959375, at *4 ("Courts in the Second Circuit have consistently held that when a plaintiff fails to offer any medical

---

[7] The August 2007 incident at Plaintiff's apartment occurred approximately two months **after** Plaintiff sought an accommodation from Defendants, and is not probative as to whether Plaintiff was "disabled" within the meaning of the Rehabilitation Act on June 7, 2007. (See Emanuel Dep. at 69:2–70:3); Heilweil, 32 F.3d at 724.

13

evidence substantiating the specific limitations to which [she] claims [she] is subject due to [her] condition, [she] cannot establish that [she] is disabled within the meaning of the [Rehabilitation Act]." (citation and internal quotations omitted)); Ragusa v. Malverne Union Free Sch. Dist., 582 F. Supp. 2d 326, 342 (E.D.N.Y. 2008). Indeed, Plaintiff's doctor, Dr. Babb, confirmed on June 8, 2007 that Plaintiff is "able to work" and that she "can perform normal duties" and her "condition is generally well controlled."[8] Nor does Plaintiff's own testimony that she became

---

[8] Plaintiff did not produce any depositions or affidavits from medical doctors. See Brown, 2007 WL 959375, at *3; see also Addoo v. N.Y. City Bd. of Educ., No. 04 Civ. 2255, 2006 WL 5838977, at *7 n.1 (E.D.N.Y. Dec. 18, 2006) ("The court notes that [plaintiff] has not proffered any admissible medical evidence in the form of sworn affidavits from medical professionals.") The medical evidence adduced by Plaintiff consists of the following:

(1) a form completed by Dr. Babb on June 8, 2007, which states that Plaintiff is "able to work"; she "can perform normal duties"; she is "not incapacitated"; her "condition is generally well controlled"; her "continuing treatment" involves "maintenance care every 6 [weeks] to 2 months"; and "patient will be absent when she has an asthma exacerbation." (Avallone Decl. Ex. N (Certification of Health Care Provider, dated June 8, 2007));

(2) another form completed by Dr. Babb on June 8, 2007, which states that Plaintiff "had an asthma exacerbation" on June 7, 2007 (id. Ex. M ("Ms. Andrea Emanuel is under my care. He/She was seen in my offic today. . . . [S]he had an asthma exacerbation on 6/7/07. Please excuse her early departure from work on 6/7/07. Also excuse her absence from work on 6/8 and 6/9/07. The condition was brought on by paint fumes in her work environment. She should be medically able to return to work on 6/10/07."));

(3) an Employee Accident/Injury Report of Hernandez that Plaintiff experienced "shortness of breath" on June 7, 2007 (id. Ex. H (Employee Accident/Injury Report, dated June 7, 2007) ("Medical Findings: Shortness of breath . . . Treatment Provided: Advised to avoid causative factors such as paint fumes and get an evaluation from a medical doctor.")); and

(4) two medical prescription forms completed by Dr. Melamed stating that Plaintiff was unable to work on August 15, 2005, August 16, 2005, and August 23-25, 2005 (id. Ex. L (Prescription dated Aug. 16, 2005) ("Andrea Emanuel . . . The above named Pt[.] is unable to work as of 8/15/05[.] Diag. Bronchial Asthma[.] May return to work on 8/17/05[.]"); id. (Prescription dated Nov. 23,

"short-winded" during the Gym Incident in 2006 and/or that she experienced "tightness of chest and shortness of breath" on June 7, 2007 before leaving the Restriction Unit ("maybe a minute or a second [later]") demonstrate a substantial limitation under the Rehabilitation Act. (Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40; Emanuel Dep. at 63:20-25); see White v. Honda of Am. Mfg., Inc., 241 F. Supp. 2d 852, 857 (S.D. Ohio 2003) ("Although [p]laintiff . . . may be at risk of suffering asthma symptoms, her symptoms do not substantially limit her major life activity of breathing. . . . [Her] asthma only affects her when she breathes certain irritants like exhaust and paint fumes."). Plaintiff has failed to produce "enough evidence of off-the-job breathing problems to find a substantial limitation of that life activity." Muller, 187 F.3d at 314.

In Muller v. Costello, the United States Court of Appeals for the Second Circuit held, in a case quite similar to the instant case, that a correction officer's "proof of his breathing impairment was deficient" because, among other reasons, "[o]ther than [plaintiff's] difficulties while at work . . . what we are left with is testimony that [plaintiff] was physically active outside of work, that he could potentially have severe reactions to environmental irritants, and that, on one occasion, he did have such a reaction while working." Muller, 187 F.3d at 314.[9] Even though the plaintiff's expert in Muller had "presented evidence of the nature of the condition and opined that irritants might be expected to produce an adverse effect on [plaintiff's] breathing," the Court of Appeals declined "[w]ithout actual evidence of difficulty outside of work . . . [to]

---

2005) ("Emanuel Andrea . . . The above named Pt. is unable to work as of 11/23/05[.] Diag: Asthma[.] May return to work on 11/26/05[.]").)

[9]   In Muller, the Court of Appeals held, in resolving post trial motions, that there was "insufficient evidence before the jury for it to have concluded that Muller was substantially limited in his major life activity of working" and that "there is not enough evidence of off-the-job breathing problems to find a substantial limitation of that life activity." Muller, 187 F.3d at 313–14.

speculate on the severity of a disability or the types of allergens that [plaintiff] might encounter on a daily basis." Id. (emphasis omitted).

And, while Plaintiff also argues that she suffers from Graves Disease and hyperthyroidism, she fails to produce any evidence (medical or otherwise) in support of her claims. (See Pl. Opp'n at 8); Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 391 (S.D.N.Y. 1998) (plaintiff "has not submitted any admissible medical evidence to support his [disability] claim").[10] Again, Plaintiff acknowledged during her deposition that "there [are no] things that [she] used to do before the diagnosis [of Graves Disease] that she cannot do at all" after the diagnosis and that "there [are no] things that [she] used to do before the diagnosis that she [does] now [but only] with difficulty." (Emanuel Dep. at 59:14-23.)

### (ii) Record of Disability

Even where, as here, there is no evidence that any of a plaintiff's major life activities are substantially limited, a plaintiff may still be found to be disabled if she demonstrates "a record" of an impairment that has substantially limited one or more major life activities. Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 645 (2d Cir. 1998); see 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(2)(B). "This part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment." Colwell, 158 F.3d at 645 (quoting 29 C.F.R. pt. 1630 App., § 1630.2(k)).

---

[10]  Plaintiff has offered only her own testimony that: she was prescribed Synthroid, Fosamax, and iron because she has "Graves Disease"; "Graves Disease means that . . . [she] suffer[s] from [h]yperthyroidism" and "the metabolism in [her] body becomes over active"; an internist (Dr. Polano) diagnosed her as having Graves Disease in 2002 because her "hair was falling out," her "eyes were bulging," her "skin turned a shade of orange," and she was "suffering from severe headaches and dizziness"; when she returned in April 2003 after having been "out of work for five-and-a-half months" there was a "vast change" in her appearance due to Graves Disease; and when she was first diagnosed "with the thyroid disease it gave her high blood pressure" but she "never had high blood pressure again." (Emanuel Dep. at 9:25–10:11, 12:17-19, 15:3-6, 49:18-25, 50:20-23, 57:14-24, 73:14–74:8, 80:25–81:5.)

There is no such record here. Plaintiff has failed to adduce non-conclusory evidence from which a reasonable factfinder could find a record of substantially limiting impairment. See Colwell, 158 F.3d at 645–46 ("[T]he records of impairment that . . . plaintiff showed involve[] no greater degree of [past] limitation of major life activities than the continuing impairments they showed."). The medical information submitted by Plaintiff, as noted, consists of the following: (1) the form (referred to supra note 8) completed by Dr. Babb on June 8, 2007, which states that Plaintiff is "able to work"; that she "can perform normal duties"; that she is "not incapacitated"; that her "condition is generally well controlled"; that her "continuing treatment" involves "maintenance care every 6 [weeks] to 2 months"; and that she "will be absent when she has an asthma exacerbation"; (2) the form (referred to supra note 8) completed by Dr. Babb on June 8, 2007, which states that Plaintiff "had an asthma exacerbation" on June 7, 2007 "brought on by paint fumes in her work environment"; (3) Hernandez's finding (referred to supra note 8) that Plaintiff experienced "shortness of breath" on June 7, 2007; (4) Dr. Melamed's conclusion (referred to supra note 8) that Plaintiff would be "unable to work" on August 15 and 16, 2005 because "Diag. Bronchial Asthma[.]"; and (5) Dr. Melamed's conclusion that she would be "unable to work" on August 23-25, 2005 because "Diag: Asthma[.]" (Avallone Decl. Exs. L (Prescriptions dated Aug. 16, 2005 and Nov. 23, 2005), H (Employee Accident/Injury Report, dated June 7, 2007), M, N (Certification of Health Care Provider, dated June 8, 2007); see Walker v. Independence Blue Cross, No. Civ. A. 03-6396, 2005 WL 1266590, at *6 (E.D. Pa. May 27, 2005) ("[L]ike proof of a disability itself, proof of a record of disability demands evidence of a substantial limitation in the performance of a major life activity. A mere diagnosis of a particular impairment is not enough."); see also Levine v. Smithtown Cent. Sch. Dist., 565 F. Supp. 2d 407, 426 (E.D.N.Y. 2008).

### (iii) Perceived Disability

Defendants argue, among other things, that Plaintiff "presents no evidence showing that [Defendants] perceived her as having an impairment that substantially limited a major life activity." (Def. Mem. at 21.) Plaintiff counters, among other things, that Defendants "were aware of [Plaintiff's] impairment due to her [a]sthma and Graves Disease prior to June 7, 2007" because Lincoln "received a voluminous amount of medical notes from [Plaintiff's] doctor explaining [her] absence from work due to her [a]sthma"; "[o]n at least two separate [prior] occasions, [Plaintiff] was reassigned from her scheduled post to a different location within the facility because of her [a]sthma"; and "most staff were aware of [Plaintiff's] impairment" because of the "small size of the facility." (Pl. Opp'n at 16–17.)

To establish a perceived or "regarded as" disability, a plaintiff "must show [either] 'that her employer erroneously believed that she was substantially limited in her ability to work,' or 'mistakenly believed that she was substantially limited in other major life activities, such as breathing.'" Droutman, 2005 WL 1796120, at *7 (quoting Murphy v. Bd. of Educ. of Rochester City Sch. Dist., 273 F. Supp. 2d 292, 320 n.24 (W.D.N.Y. 2003)). "A plaintiff proceeding on a 'regarded as' theory of disability faces a 'particularly heavy burden.'" Id.

Plaintiff fails to raise a triable issue of fact that Defendants regarded her as disabled. See Okoro v. Marriott Int'l, Inc., No. 07 Civ. 165, 2008 WL 4449386, at *9 (S.D.N.Y. Sept. 29, 2008). That is, Plaintiff has not adduced any non-conclusory evidence that Defendants regarded her as substantially limited in the major life activities of breathing or working – or any other major life activity. See Droutman, 2005 WL 1796120, at *7. The "voluminous amount of medical notes" Plaintiff testified she provided to Defendants prior to June 7, 2007, in fact, appears to consist solely of Dr. Melamed's observations (referred to supra note 8) on medical

18

prescription forms, dated August 16, 2005 and November 23, 2005, that Plaintiff was unable to work on August 15 and 16, 2005 and on August 23-25, 2005 due to "asthma." (Pl. Opp'n at 17 (citing Avallone Decl. Ex. L)); see Droutman, 2005 WL 1796120, at *7 ("A doctor's note of this sort, without more, cannot support [plaintiff's] claim of 'regarded as disabled' discrimination."); Bush, 268 F. App'x at 41. Moreover, even if Defendants knew of Plaintiff's asthma because they presumably "switched [her] post . . . due to [her] respiratory illnesses" on two occasions in the past, as Plaintiff testified (see Emanuel Dep. at 103:9–104:6), a reasonable factfinder could not conclude from this that Defendants regarded Plaintiff as substantially limited in her ability to breathe or work. See Heilweil, 32 F.3d at 720 ("[T]he inability to satisfy the requirements of a particular assignment does not mean such a person is regarded as [disabled]" because, to meet the statutory definition, "the employee's impairment must limit her employment generally."). Nor is Plaintiff's sweeping testimony that "everybody [knew] what everybody [was] suffering from [because] [t]hat's just how the jail is" sufficient to establish that Defendants perceived Plaintiff as disabled within the meaning of the Rehabilitation Act. (Emanuel Dep. at 113:10-17); see Mitchell v. Nat'l R.R. Passenger Corp., 407 F. Supp. 2d 213, 239 (D.D.C. 2005).[11]

### (2) Reasonable Accommodation

The Court need not reach Plaintiff's argument that Defendants failed to provide a reasonable accommodation because Plaintiff has failed to make a prima facie showing that she is an individual with a disability under the Rehabilitation Act. See Lord v. Arizona, 286 F. App'x 364, 366 n.2 (9th Cir. 2008). The Court notes that Plaintiff was sent for medical treatment when

---

[11] Even assuming, arguendo, that Defendants regarded Plaintiff as having a disability within the meaning of the Rehabilitation Act, "[i]t is not at all clear that a reasonable accommodation can ever be required in a 'regarded as' case (such as this one) in which . . . the plaintiff was not, in fact, disabled." Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 105 n.3 (2d Cir. 2003) (citing Weber v. Strippit, Inc., 186 F.3d 907, 917 (8th Cir. 1999)).

19

she complained about paint fumes on June 7, 2007 and did not, in fact, return to the Restriction Unit (where the painting was occurring) even though her request for reassignment was apparently denied.

## V.     Conclusion and Order

For the foregoing reasons, Defendants' motion for summary judgment [#36] is granted in its entirety. The Clerk of the Court is respectfully requested to close this case.

Dated: New York, New York
       November 25, 2009

_____
RICHARD M. BERMAN, U.S.D.J.